**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **KROGER SPECIALTY PHARMACY FL 2, LLC; KROGER SPECIALTY PHARMACY LA, LLC; KROGER SPECIALTY PHARMACY HOLDINGS 2, INC.; and KROGER SPECIALTY PHARMACY HOLDINGS, INC.,** | ) ) ) ) ) ) ) | **Case No. 3:23-cv-001217 Judge Aleta A. Trauger** |
|     **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **GENEFIC SPECIALTY PHARMACY, INC. and RICHARD BROOKS MADISON,** | ) ) ) ) ) | |
|     **Defendants.** | ) | |

## MEMORANDUM

Before the court are (1) the Motion to Dismiss (Doc. No. 46) filed by defendants Genefic Specialty Pharmacy, Inc. ("Genefic") and Richard Brooks Madison, seeking dismissal of the First Amended Complaint ("FAC") (Doc. No. 45) filed by plaintiffs Kroger Specialty Pharmacy FL 2, LLC ("KSP FL 2"), Kroger Specialty Pharmacy Holdings, Inc. ("KSP Holdings"), Kroger Specialty Pharmacy LA, LLC ("KSP LA"), and Kroger Specialty Pharmacy Holdings 2, Inc. ("KSP Holdings 2"); and (2) plaintiff KSP FL 2's Motion for Preliminary Injunction (Doc. No. 39)—which the court now construes as having been brought on behalf of all four plaintiffs named in the FAC—seeking to enjoin Madison from violating (or continuing to violate) the Confidentiality, Non-Disclosure, Non-Competition, and Non-Solicitation Agreement ("Agreement" or "non-compete Agreement") he entered into with Modern HC Pharmacy, Inc. ("MHCP") on April 1, 2015 (Doc. No. 45-2) and to enjoin Genefic from interfering with the

Agreement.

As set forth herein, the court will grant in part and deny in part the Motion to Dismiss and will grant the Motion for Preliminary Injunction, insofar as it is brought by plaintiffs KSP Holdings 2 and KSP LA.

## I.  FACTUAL AND PROCEDURAL HISTORY

### A.  The Pleadings and The Motion to Dismiss

KSP FL 2 initiated this lawsuit on November 17, 2023, seeking a temporary restraining order and injunctive relief against both defendants. (Doc. No. 1.) Very generally, the Complaint alleges that Madison had formerly been employed by KSP FL2; that he had entered into the Agreement with MHCP while employed by MHCP; that MHCP was the predecessor-in-interest to KSP FL 2, making KSP FL 2 entitled to enforce the Agreement; and that the Agreement prohibited Madison from, among other things: "(a) working for a competitor for 1 year after termination [within] the Restricted Area (as defined in [the A]greement); (b) soliciting customers, referral sources and/or patients in the Restricted Area; and (c) using [KSP FL 2's] confidential information to compete unfairly." (Doc. No. 1 ¶ 1.) Notwithstanding his Agreement, Madison had left KSP FL 2's employment, gone to work for defendant Genefic, a direct competitor, and engaged in precisely the activities barred by the Agreement. KSP FL 2 filed a Motion for Temporary Restraining Order ("TRO Motion") (Doc. No. 7) the same day it filed the Complaint, supported by the Affidavit of Jeremy Richardson, Vice President of Sales, Marketing & Trade Relations for "Kroger Specialty Pharmacy" (i.e., not specifically KSP FL 2) (Doc. No. 7-1, Richardson Aff. ¶ 1).

After the court scheduled a hearing on the TRO Motion for December 28, 2023, KSP FL 2 voluntarily withdrew the motion, citing "certain documentation and other discovery issues discussed by the parties' counsel since the filing of the lawsuit" and signaling the parties' intent to file a joint motion to conduct expedited discovery in advance of a preliminary injunction hearing.

(Doc. No. 25.) The parties did so; the court granted the motion and scheduled the preliminary injunction hearing. (Doc. Nos 27, 29.) KSP FL 2 filed its Motion for Preliminary Injunction and supporting Memorandum on February 16, 2024. (Doc. Nos. 39, 40.)

Meanwhile, the defendants filed an Answer to the original Complaint, admitting that Madison began working for MHCP in April 2015 and was formerly employed by KSP FL 2. (Doc. No. 32 ¶¶ 1, 14.) Notwithstanding these admissions, the plaintiff withdrew both of those allegations in the First Amended Complaint ("FAC") (Doc. No. 45), filed, with the defendants' consent, on February 27, 2024 (after filing the Motion for Preliminary Injunction).

The FAC brings claims on behalf of all four plaintiffs identified above. Notably, the FAC alleges that Madison is a "former employee of KSP LA and KSP Holdings 2"—not KSP FL 2. (FAC ¶¶ 9, 16.) It alleges that Madison began working for an entity known as Total Life Care Rx Pharmacy, LLC ("TLCRx Pharmacy") in 2013 but was working for MHCP in April 2015 when he signed the Agreement. (FAC ¶¶ 17, 18.) Regarding the plaintiffs' capacity to enforce the Agreement, the FAC alleges that, in July 2016, Modern HC Holdings, Inc. (MHCP's "holding company"—*i.e.*, parent corporation) and Axium Pharmacy Holdings, Inc. ("Axium") (which was already owned by The Kroger Co.) entered into a stock purchase agreement ("SPA") and then engaged in corporate rebranding and various entity name changes. (FAC ¶¶ 26–28.) Axium became KSP Holdings; MCHP became KSP Holdings 2; TLCRx Pharmacy became KSP LA; and TLCRx, LLC became KSP FL 2. (FAC ¶¶ 30–33.) In other words, KSP Holdings now "holds" KSP Holdings 2, while KSP LA and KSP FL 2 are, according to the FAC, "affiliates" of both. (*See* FAC ¶ 29; *see also* Doc. No. 45-2, Agreement ¶ 1 (identifying TLCRx Pharmacy and TLCRx, LLC as "affiliates" of MHCP).) The FAC does not allege that Madison was ever employed by either KSP Holdings or KSP FL 2, nor does it identify any basis or mechanism through which

either KSP Holdings or KSP FL 2 would have the capacity to enforce the Agreement.

The FAC continues to allege that Madison has materially breached the Agreement, causing KSP LA and KSP Holdings 2 irreparable harm (FAC ¶ 52), through his employment with Genefic, a specialty pharmacy in direct competition with KSP LA (FAC ¶ 47), by (1) engaging in the sale of the same specialty medications he previously sold as an employee of KSP LA and KSP Holdings 2, within the "Restricted Area" covered by the Agreement; (2) soliciting customers, referral sources and/or patients of KSP LA and/or KSP Holdings 2 within the Restricted Area, using Confidential Information (as defined in the Agreement) to engage in such solicitation, and by soliciting (successfully in at least one case) employees of KSP LA and KSP Holdings 2 to leave that employment and go to work for Genefic. Based on that conduct, and Genefic's knowledge of the Agreement and involvement in Madison's activities, the FAC states claims for (1) breach of contract against Madison; (2) trade secret misappropriation against Madison and Genefic; (3) tortious interference with a contractual relationship against Genefic; and (4) tortious inducement of breach of contract against Genefic.

Immediately after the plaintiffs filed the FAC and while briefing on the Motion for Preliminary Injunction was ongoing, the defendants filed their Motion to Dismiss the FAC. (Doc. No. 46.) As set forth in their supporting Memorandum of Law (Doc. No. 47), the sole basis for dismissal of the claims brought by plaintiffs KSP LA and KSP Holdings 2 is that these entities are, respectively, a foreign limited liability company and a foreign corporation that were (as of the date the Motion to Dismiss was filed) transacting business in Tennessee without a certificate of authority, as a result of which they lack(ed) legal capacity to bring a lawsuit in any court within this state, pursuant to Tenn. Code Ann. §§ 48-246-601(a) and 48-65-102(a). In addition, the defendants seek dismissal of the claims brought by KSP FL 2 and KSP Holdings on the grounds

that the FAC fails to state a claim on behalf of these entities for which relief can be granted. (Doc. No. 47, a 2, 4–6.)

In their Response to the Motion to Dismiss (Doc. No. 60), the plaintiffs explain that

[o]riginal Plaintiff KSP FL 2 added new Plaintiffs KSP LA, KSP Holdings, and KSP Holdings 2 in the First Amended Complaint to address Defendants' arguments during expedited discovery that KSP FL 2 did not have 'standing" to enforce Madison's Agreement. KSP LA was added as a Plaintiff because it is the entity that paid Madison during his employment. KSP Holdings was added as a Plaintiff because it is the (now renamed) buyer in the July 19, 2016 Stock Purchase Agreement whereby Kroger and its affiliate Axium Pharmacy Holdings, Inc. (now renamed KSP Holdings) purchased the stock of Modern HC Holdings. And KSP Holdings 2 (formerly named Modern HC Pharmacy) was added as a Plaintiff because it is the now-renamed entity with which Madison entered into the Agreement at issue.

(Doc. No. 60, at 1–2.) Responding to the defendants' arguments, the plaintiffs do not dispute the legal basis for the dismissal of KSP LA and KSP Holdings 2. Instead, they assert—and have produced evidence establishing—that these entities are both now authorized to transact business in Tennessee, KSP LA having applied for and obtained a license to do business in Tennessee as of March 4, 2024 and KSP Holdings 2 having applied for and obtained a license to do business in Tennessee effective March 5, 2024. (*See* Doc. Nos. 60-1, 60-2, 60-3.) They argue that the Motion to Dismiss as to these plaintiffs has thereby been rendered moot.

Regarding KSP FL 2 and KSP Holdings, the plaintiffs argue rather vaguely that these entities are properly named as plaintiffs, first, because they are both "affiliates" of plaintiff KSP Holdings 2 and, as such, are protected by express contractual provisions in the Agreement that is at issue in this case. They also contend that KSP Holdings is a proper plaintiff because "KSP Holdings is the now renamed buyer in the Stock Purchase Agreement. And the Stock Purchase Agreement is the 'vehicle' by which Modern HC Holdings became a company owned by Kroger Specialty Pharmacy." (Doc. No. 60, at 2, 3–4.) In other words, KSP Holdings is the parent company of KSP Holdings 2. (*See id.* at 4.)

The defendants filed a Reply, arguing that KSP FL 2 and KSP Holdings' status as "affiliates" or, in the case of KSP Holdings, a parent corporation of the entity with which Madison entered the Agreement, does not confer on them standing to enforce that Agreement. (Doc. No. 62, at 5, 6.) Regarding KSP LA and KSP Holdings 2, the defendants do not dispute that these entities obtained certificates of authority to conduct business in Tennessee. Instead, they raise the novel argument that these plaintiffs, despite now having obtained such certificates of authority, should be barred by the doctrine of judicial estoppel or quasi-estoppel from pursuing this lawsuit, because they have taken inconsistent positions in this lawsuit and in their Applications for Certificate of Authority regarding the date they commenced doing business in this state.

Upon being directed to do so by the court, the plaintiffs filed a Sur-Reply to address this argument. (Doc. No. 72.) They argue both that judicial estoppel is a disfavored doctrine not warranted under the facts of this case and that the defendants' position is factually inaccurate.

## B.     The Preliminary Injunction Motion

The plaintiffs' Motion for a Preliminary Injunction argues that they will likely succeed on the merits of their claims that Madison breached the Agreement and that Genefic tortiously interfered with that Agreement, insofar as Genefic knew of its existence and intentionally procured its breach, resulting in damages to the plaintiffs. They also argue that they will suffer irreparable harm absent injunctive relief, particularly in light of evidence that Madison is actually soliciting KSP customers and current employees, and his working for Genefic poses a substantial threat of a continued loss of customers and goodwill. They argue that the balance of harms weighs in their favor, as enforcing the Agreement will prevent further irreparable injury to them and will not harm either Madison or Genefic, as the plaintiffs only seek to enforce the Agreement in the state of Tennessee, leaving Madison free to work for Genefic in any other sales territory outside the state. They also point out that the Agreement contains a Florida choice of law provision and that, under

Florida law, the court "should not consider individual economic hardship that may be caused to the person against whom enforcement is sought." Fla. Stat. Ann. § 542.335(1)(g). They further argue that "Genefic hired Madison to shortcut the development of the specialty pharmacy business that affords KSP significant competitive advantages in the marketplace, and also to solicit other KSP employees to come to Genefic with him," and that a preliminary injunction would simply require Madison to honor his Agreement and "prevent Genefic from taking advantage of Madison's many violations of his Agreement." (Doc. No. 40, at 19.) Finally, they argue that the public interest would be served by enforcing a valid and reasonable agreement.

The plaintiffs request that the court enjoin Madison from (1) soliciting or encouraging any customer of KSP LA to terminate or diminish its business relationship with KSP LA;(2) hiring, soliciting for hiring, or seeking to persuade any employee of KSP LA to discontinue his or her employment with KSP LA; and (3) working or providing services to defendant Genefic Specialty Pharmacy, Inc. ("Genefic") in any other way that violates the April 2015 Agreement, specifically including working or providing services to Genefic within the state of Tennessee. They request that Genefic be enjoined from interfering with the Agreement. (*See* Doc. No. 40-1 (Proposed Preliminary Injunction).)[1]

Just after filing their Motion to Dismiss, the defendants filed a Response in Opposition to the Motion for Preliminary Injunction (Doc. No. 48), and a Reply was filed on behalf of all four plaintiffs (Doc. No. 52). As noted above, the court construes the Motion for Preliminary Injunction to have been filed on behalf of all four plaintiffs.

---

[1] To the extent the "Sales Territory" or "Restricted Area" is defined more broadly in the Agreement to cover states "adjacent" to Tennessee, the plaintiffs have stipulated that they seek to enjoin the plaintiff only from working in a prohibited capacity for Genefic within the State of Tennessee. (*See* Doc. No. 65, at 155.)

While the plaintiffs' motion focused on the substantive elements they needed to prove in order to be entitled to a preliminary injunction enforcing the Agreement, the defendants' Response is primarily focused on the plaintiffs' confusing and conflicting explanations as to the relationships between and among the various corporate entities and Madison.[2] The relationships between the plaintiffs (and other related entities) has been largely clarified by the plaintiffs' production of pre- and post-name change corporate charts. (Doc. No. 48-2.) These charts establish that, sometime in 2014, MHCP acquired, and became the parent company of, TLCRx Pharmacy, while each maintained its separate corporate existence. After the 2016 SPA between MHCP's parent company and an entity related to the Kroger Company, MHCP changed its named to KSP Holdings 2 but remained the parent or holding corporation for a number of "Kroger Specialty Pharmacy" entities, including TLCRx Pharmacy, which changed its name to KSP LA, and Kroger Specialty Pharmacy Holdings 3, LLC, which is the holding company or direct parent of KSP FL 2 (formerly TLCRx, LLC). (*See id.* at 1–2.)

In fact, as the defendants point out, this case has been markedly reconfigured since the filing of the original Complaint, as the plaintiffs have now stipulated through counsel, during the deposition of the plaintiffs' Rule 30(b)(6) representative, that (1) TLCRx Pharmacy is the same entity as KSP LA (Doc. No. 49, Richardson Rule 30(b)(6) Dep. 16); (2) MHCP and KSP Holdings 2 are the same entity (*id.* at 17); and (3) Madison was never employed by KSP FL (*id.* at 33). The plaintiffs' position now is that Madison was employed by KSP LA from February 2013 to 2014, and then jointly employed by MHCP (now known as KSP Holdings 2) from 2014 to September 18, 2023. (*Id.*) The evidence on which the plaintiffs rely for their joint employment theory is the

---

[2] The plaintiffs', their counsel's, and their corporate representative's apparent failure to fully understand the organizational structure of the related entities *before* filing suit is puzzling, to say the least.

Agreement between MHCP and Madison and the fact that MCHP/KSP Holdings 2 purchased the stock of TLCRx Pharmacy in 2014. (*See id.* at 33.) Counsel for the plaintiffs also stipulated during Richardson's deposition that only KSP Holdings 2, formerly MHCP, has the right to enforce the Agreement. (*Id.* at 84–85.)

According to the defendants, the plaintiffs' Motion for Preliminary Injunction "cannot survive these stipulations" (Doc. No. 48, at 12), because (1) KSP FL 2 has no right to enforce the Agreement; (2) Madison was actually employed by KSP LA, but KSP LA is not a party to and has no right to enforce the Agreement; (3) Madison was never employed by MHCP, so the Agreement, the restrictive covenants of which are defined in terms of Madison's employment with MHCP (instead of, for example, MHCP *and/or* one of its Affiliates), is not enforceable; (4) even if it were otherwise enforceable, the Agreement was superseded by Incentive Compensation Plans signed by Madison in 2020, 2021, and 2022; and (5) under Tennessee law, which the defendants contend applies to the Agreement, the balance of harms and the public interest weigh in favor of declining to enforce the restrictive covenants.

The plaintiffs' Reply urges the court to disregard the defendants' distracting "technical" arguments regarding corporate formalities and to focus on the undisputed facts regarding Madison's breach of the Agreement. They dispute the defendants' specific arguments and contend that, whether Florida law (under the Agreement's choice-of-law provision) or Tennessee law applies, the plaintiffs have a substantial likelihood of success on the merits of their claims based on Madison's breach of the restrictive covenants set forth in the Agreement.

Following briefing, the court held an evidentiary hearing on March 14, 2024, at which defendant Madison and the plaintiffs' corporate representative, Jeremy Richardson, both testified at length. (Transcript, Doc. No. 65.) At the close of the hearing, the parties identified three issues

that remained in dispute: (1) whether Madison was employed by MHCP; (2) what effect, if any, did the language of his Incentive Compensation Plans have on the Agreement; and (3) if the plaintiffs think Madison was employed by MHCP, "what kind of business, if any, did it engage in during that period." (Doc. No. 65, at 198.) The parties proposed, and the court permitted, additional post-hearing briefing focused on these issues. Accordingly, each party thereafter submitted a Post-Hearing Brief (Doc. Nos. 66, 67) and then a Response to each other's Post-Hearing Brief (Doc. Nos. 68, 69), none of which actually plows any new ground.

## II. THE MOTION TO DISMISS

### A. Standard of Review

Typically, to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter . . . 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a "plausible" claim for relief does not require a showing of probable liability, it requires more than "a sheer possibility that a defendant has acted unlawfully." *Id.* The complaint must allege sufficient facts to allow the court "to draw the reasonable inference that the defendant is liable." *Id.* In other words, a plaintiff must provide a "short and plain statement of the claim showing that [he] . . . is entitled to relief." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (quoting Fed. R. Civ. P. 8(a)(2)).

To meet this pleading standard, a complaint must contain "either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 275–76 (6th Cir. 2010) (citation omitted). And "conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Id.* at 276 (citation omitted). In short, an action will be dismissed where "there is no law to support the claims made" or "the facts alleged are insufficient to state a claim." *Stew Farm, Ltd. v. Nat.*

*Res. Conservation Serv.*, 967 F. Supp. 2d 1164, 1169 (S.D. Ohio 2013).

"In reviewing a motion to dismiss, [the court] construe[s] the complaint in the light most favorable to the plaintiff, draw[s] all reasonable inferences in its favor, and accept[s] all well-pleaded allegations in the complaint as true." *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 310 (6th Cir. 2021). But that does not mean the court must take everything plaintiffs allege at face value, no matter how unsupported. The court may disregard "naked assertions" of fact or "formulaic recitation[s] of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

And the court has limited ability to consider materials outside the pleadings. "Generally, in considering a motion to dismiss, the district court is confined to considering only the pleadings, or else it must convert the motion into one for summary judgment under Rule 56." *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023). However, "the court may, in undertaking a 12(b)(6) analysis, take judicial notice of matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." *Id.* (internal quotation marks and citations omitted.

**B.      Analysis**

Given the large volume of evidence that has been placed in the record since the filing of the Motion to Dismiss, it seems somewhat absurd to consider the motion based on the pleadings alone. At the same time, this motion logically must be considered first, because a finding in favor of the defendants would render utterly moot the plaintiffs' request for injunctive (or any) relief. Moreover, most of the evidence presented at the hearing on the Motion for Preliminary Injunction has little bearing on the matters raised in the defendants' Motion to Dismiss.

*1.      KSP Holdings 2 and KSP LA*

First, as to the question of whether KSP Holdings 2 and KSP LA are barred by the doctrine of judicial estoppel or quasi-estoppel from pursuing their claims, it is now undisputed that these

two entities have been granted certificates of authority to do business in Tennessee. Tenn. Code Ann. §§ 48-246-601(a) and 48-65-102(a) provide that neither a foreign limited liability company nor a foreign corporation transacting business in this state may "maintain a proceeding in any court in this state until it obtains a certificate of authority." And a court may stay proceedings until such an entity obtains the certificate. Tenn. Code Ann. §§ 48-246-601(c) and 48-65-102(c); *see also Sharper Impressions Painting Co. v. Yoder*, No. M2015-00841-COA-R9-CV, 2016 WL 5210867, at *3 (Tenn. Ct. App. Sept. 19, 2016) ("Under the plain language of the statute, [the plaintiff] could not maintain an action in a Tennessee court 'until it obtain[ed] a certificate of authority.' We conclude that the statute is equally clear that, once it obtained a certificate of authority, [the plaintiff] was authorized to maintain its action against [the defendant]."). As a result, the defendants' original argument for dismissing the claims by these plaintiffs has been rendered moot.

In their Reply in support of the Motion to Dismiss, the defendants tacitly acknowledge as much, but they now argue that, on their Applications for Certificates of Authority, the plaintiffs misstated the dates on which they began doing business in the state by indicating "none" in the places on the applications for indicating on what date, if any, they began conducting business in the state prior to the date of their application. By doing so, the defendants argue, the plaintiffs were "able to obtain a certificate of authority immediately and did not have to pay treble fees, penalties and taxes, as well as interest, for prior years." (Doc. No. 62, at 2.)[3] The defendants point out that the form itself requires the person submitting the application to "certify" that she is the person whose signature appears on the filing, that she is authorized to file the application, and that the

---

[3] The statutes further require a business that began conducting business in the state prior to obtaining a certificate of authority to first pay a penalty and the fees and taxes it should have paid, had it obtained a certificate of authority at the outset. Tenn. Code Ann. §§ 48-246-601(d)–(e) and 48-65-102(d)–(e); *see also Sharper Impressions Painting Co. v. Yoder*, No. M2015-00841-COA-R9-CV, 2016 WL 5210867, at *4 (Tenn. Ct. App. Sept. 19, 2016) (explaining the process).

information submitted is "true and correct to the best of [her] knowledge." (*See* Doc. No. 62-1.) The form also contains a notice that "[f]iling a false document could result in criminal penalty and prosecution." (*Id.*) Based on these requirements, the defendants argue that KSP Holdings 2 and KSP LA should not be

> allowed to tell the Tennessee Secretary of State that [they] started doing business in Tennessee on March [4 and] 5, 2024 (and thereby avoid treble fees, penalties, and taxes, as well as interest), while simultaneously claiming that Madison's restrictive covenants should be enforced because (i) it employed Madison from at least 2015 to 2023, (ii) he engaged in extensive business activities on its behalf throughout Tennessee from at least 2015 to 2023 and (iii) it has legitimate business interests (including current customers) throughout Tennessee that warrant protection by restrictive covenants.

(Doc. No. 62, at 4; *see also id.* at 5.) To be clear, the defendants are *not* arguing that the certificates of authority are invalid because the plaintiffs falsified information. Instead, they are arguing that the plaintiffs should be barred by the doctrine of quasi-estoppel or judicial estoppel from taking a position in their filings with the Tennessee Secretary of State that is inconsistent with their position in this court.

In their Sur-Reply, the plaintiffs argue that the defendants' original basis for dismissal has been rendered moot, as KSP Holdings 2 and KSP LA have now obtained certificates of authority. They further argue that quasi-estoppel/judicial estoppel does not apply in this situation; and that, even if it did, they have not made any inconsistent statements to which it would attach. With their Sur-reply, the plaintiffs submitted the Declaration of Dorothy Roberts, who explains that, as Senior Paralegal and Assistant Secretary for the Kroger Company, she completed an Application for Certificate of Authority for both KSP Holdings 2 and KSP LA, on March 5 and March 4, 2024 respectively, using the Tennessee Secretary of State's online electronic filing system. (Doc. No. 72-1, Roberts Decl. ¶¶ 2–5.) According to Roberts, one of the "item[s] of information" requested in each application was, "if, prior to qualifying, the date [entity] commenced doing business in

Tennessee." (*Id.* ¶¶ 8, 13.) Roberts attests that she did not fill in any information in response to these requests and "did not supply the word '(none)' that appears" on the final application. (*Id.*) Her understanding is that "this is not a field that needs to be completed to process the Application." (*Id.*) That understanding is based on the fact that she did not supply any information in response to this request, but the "Tennessee Secretary of State still processed [both] Application[s] and issued the Certificate of Authority" for both. (*Id.*) She further attests, based on a telephone call to the Tennessee of Secretary of State's office, that, "for the Application sections where [she] did not enter any information, the '(none)' was automatically populated by the Tennessee Secretary of State's electronic filing system." (*Id.* ¶ 15.)

Judicial estoppel is doctrine that "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted); *see also* 18 Moore's Federal Practice § 134.30, p. 134–62 (3d ed. 2000) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding").

Relatedly, the doctrine of "quasi-estoppel" "describes a situation in which an individual is not permitted to 'blow both hot and cold,' taking a position inconsistent with prior conduct, if this would injure another, regardless of whether that person actually relied thereon. The party seeking to invoke the doctrine has the burden of proving that the other party should be estopped." *In re Anderson*, 650 B.R. 510, 517–18 (Bankr. W.D. Tenn. 2023) (quoting *PACE Indus. Union–Mgmt. Pension Fund v. Dannex Mfg. Co.*, 394 F. App'x 188, 199 (6th Cir. 2010) (applying New Jersey law)); *see also Kelley v. Kelley (In re Kelley)*, 216 B.R. 806, 808 (Bankr. E.D. Tenn. 1998) ("The doctrine of quasi-estoppel 'forbids a party from accepting the benefits of a transaction or statute

and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects.'") (quoting *Davidson v. Davidson (In re Davidson)*, 947 F.2d 1294, 1297 (5th Cir. 1991)).

Quasi-estoppel "does not require a misrepresentation by one party or actual reliance by another party." *In re Anderson*, 650 B.R. at 518 (citations omitted). Like judicial estoppel, quasi-estoppel is "directly grounded upon a party's acquiescence or acceptance of a payment or benefit, by virtue of which that party is thereafter prevented from maintaining a position that is inconsistent with those acts." *Id.* The doctrine is "inherently flexible and its application depends upon a case-by-case analysis of the equities involved, rather than upon precise definitional standards." *Id.* Some factors that courts have considered in deciding whether to apply the doctrine include:

> (1) whether the party asserting the inconsistent position has gained an advantage or produced some disadvantage through the first position, (2) the magnitude of the inconsistency, (3) whether changed circumstances tend to justify the inconsistency, (4) whether the party claiming estoppel relied on the inconsistency to his or her detriment, and (5) whether the first assertion was made with full knowledge of the facts.

*Id.* (citations omitted). The doctrine has regularly been applied to inconsistent positions taken in tax returns. *See, e.g.*, *Tri-Cities Gold, Inc. v. Talisman Invs., Inc.*, No. 2:17-CV-214, 2019 WL 7756131 at *2 (E.D. Tenn. June 24, 2019) (collecting cases).

In the present case, although the defendants invoke judicial estoppel, the situation presented here does not involve any party's taking a position under oath in a prior judicial proceeding that was adopted by a court either as a preliminary matter or as part of a final disposition. Judicial estoppel is clearly not applicable.

Regarding quasi-estoppel, besides asserting that the plaintiffs have taken inconsistent positions in their filings with the Tennessee Secretary of State and in this court, the defendants have not analyzed any of the factors potentially relevant to whether quasi-estoppel should apply. The court, upon considering the factors identified above, as relevant, finds that the factors do not

weigh in favor of estoppel. First, while the plaintiffs appear to have gained some financial advantage by having obtained certificates of authority without paying penalties, fees, or taxes for the years for which they were not authorized (or interest on those sums), they have not thereby gained a substantive advantage in this case, aside from having simply obtained a certificate of authority from the Tennessee Secretary of State. Second, while the court certainly does not minimize the importance of submitting complete and accurate information in business filings with the state, Dorothy Roberts' omission of the date on which the plaintiffs began doing business in Tennessee was not a direct representation in conflict with the plaintiffs' position in this case. Rather, the omission appears to have been made because Roberts lacked full knowledge of the facts. Moreover, the defendants did not rely on the statement at all, much less to their detriment. Accordingly, weighing the equities in this case in the exercise of its discretion, the court declines to apply quasi-estoppel.[4] The Motion to Dismiss will be denied, insofar as it seeks dismissal of the claims brought by KSP Holdings 2 and KSP LA on this ground.

### 2. KSP Holdings and KSP FL 2

The answer to the question of why the plaintiffs have continued to defend their decision to bring suit on behalf of KSP FL 2 initially and to have included both it and KSP Holdings as plaintiffs in the FAC completely eludes the court. They allege in the FAC—and the evidence developed since then establishes—that the non-compete Agreement was entered into by and between Madison and MHCP, now known as KSP Holdings 2 and that Madison at all relevant

---

[4] The court notes that, as a holding company, KSP Holdings 2 may actually not have conducted business in this state, even though it takes the position that it employed Madison within the state, as discussed below. And, while KSP LA, as Madison's direct employer, clearly has been doing business within the state, it is likely not a necessary party to this action. This is because, even though KSP LA is a beneficiary of the Agreement, the actual parties to it are KSP Holdings 2 and Madison.

times was employed by KSP LA and/or KSP Holdings 2. The FAC does not allege that Madison was ever employed by KSP FL 2 or KSP Holdings. The FAC contains no factual allegations concerning KSP FL 2 or KSP Holdings, aside from indicating that they are in some way affiliated with KSP Holdings 2 and KSP LA, but without actually explaining the corporate relationships. Beyond that, it is now undisputed that KSP Holdings is a corporate parent of KSP Holdings 2 and that KSP FL 2 is the subsidiary of a subsidiary of KSP Holdings 2.

The FAC does not remotely state a claim on behalf of these two plaintiffs. The Motion to Dismiss as to these two plaintiffs, therefore, will be granted. All further references to "plaintiffs," collectively, in this opinion, will be to KSP Holdings 2 and KSP LA.

## III. THE MOTION FOR PRELIMINARY INJUNCTION

### A. Legal Standards

A preliminary injunction is an "extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances [that] clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (internal quotation marks omitted). "The party seeking the preliminary injunction bears the burden of justifying such relief." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

In reviewing a motion for preliminary injunctive relief, the court must assess "(1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Id.* While "[t]hese factors . . . are to be balanced against each other," *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002), they do not "carry equal weight," *Memphis A. Phillip Randolph Inst. v. Hargett*, 478 F. Supp. 3d 699, 703 (M.D. Tenn. 2020). Failing to prove a likelihood of success is usually fatal to obtaining injunctive

relief, *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000), while failure to show an irreparable injury is always fatal, *D.T. v. Sumner Cty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) ("A district court abuses its discretion when it grants a preliminary injunction without making specific findings of irreparable injury." (internal quotation marks and citation omitted)).

A movant can show irreparable injury resulting from the denial of a preliminary injunction by arguing that either (1) it will experience a "harm . . . [that] is not fully compensable by monetary damages" or (2) its "claim is based upon a violation of [its] constitutional rights." *Overstreet*, 305 F.3d at 578. "[T]o merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical." *Memphis A. Phillip Randolph Inst.*, 478 F. Supp. 3d at 703–04 (citing *D.T.*, 942 F.3d at 327).

If material facts relevant to the preliminary injunction are in dispute, the court must hold an evidentiary hearing. *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007). At such a hearing, the court "may make credibility determinations and preliminary factual findings." *Int'l Union of Painters & Allied Trades Dist. Council No. 6. v. Smith*, No. 1:23-cv-502, 2024 WL 1012967, at *6 (S.D. Ohio Mar. 8, 2024) (quotation marks and internal citations omitted). To merit relief, the movant must, at a minimum, furnish sufficient evidence to make "*a clear showing*" that the balance of factors favors the issuance of a preliminary injunction. *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (emphasis omitted).

### B. Choice of Law

The Agreement contains a choice-of-law clause providing that "[a]ll issues and questions concerning the construction, validity, enforcement, and interpretation of this Agreement will be governed by, and construed in accordance with, the internal laws of the State of Florida without reference to principles of conflict of laws." (Doc. No. 45-2, Agreement ¶ 5.)

In a diversity action, the forum state's choice-of-law rules typically determine which state's substantive law will apply. *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009). Generally, under Tennessee law, the courts of this state "will honor a choice of law clause if the state whose law is chosen bears a reasonable relation to the transaction and absent a violation of the forum state's public policy." *Bourland, Heflin, Alvarez, Minor & Matthews, PLC v. Heaton*, 393 S.W.3d 671, 674 (Tenn. Ct. App. 2012). And, as a general rule, the first step in the choice-of-law analysis is "whether a conflict actually exists between the relevant laws of the different jurisdictions." *Boswell v. RFD-TV the Theater, LLC*, 498 S.W.3d 550, 555 (Tenn. Ct. App. 2016).

Neither party in this case points to any substantial differences in the general contract law of the two states, but, as it turns out, at least one Tennessee court has been confronted with a very similar question to the one here: whether to apply Tennessee or Florida law to a non-competition clause within an employment agreement that contained a Florida choice-of-law provision. *See Dill v. Cont'l Car Club, Inc.*, No. E2013-00170-COA-R3CV, 2013 WL 5874713, at *11 (Tenn. Ct. App. Oct. 31, 2013). The court noted first that the determination of which state's law applied depended on "whether applying Florida law would violate Tennessee public policy," which in turn "require[d] an examination of the law of each state." *Id.*

In Tennessee, "covenants not to compete are disfavored." *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005) (citing *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472 (Tenn. 1984)). Because they are disfavored, they are "construed strictly in favor of the employee." *Id.* However, they are enforceable so long as the employer has a "legitimate business interest to be protected and the time and territorial limitations are reasonable." *Id.* In determining whether restrictive covenants are enforceable, one of the several factors courts must consider is "the economic hardship imposed on the employee by the covenant." *Id.* (citations omitted).

As the Tennessee Court of Appeals discussed in *Dill*, the interpretation of non-competition clauses under Florida law is primarily governed by statute. And under that law, the analysis of non-competition agreements differs in two material ways from the analysis under Tennessee law: (1) Florida "requires construction in favor of the former employer seeking to enforce the covenant not to compete, as contrasted with the law in Tennessee requiring strict construction in favor of the former employee," and (2) Florida law "bars the court from considering hardship that might be caused to the employee by enforcement of the covenant not to compete." *Dill*, 2013 WL 5874713, at *12 (citing Fla. Stat. Ann. § 542.335(1)). The court in *Dill* therefore concluded that Tennessee law should be applied to the issue of the enforceability of the non-competition provisions of the employment agreements; it also observed that courts in other jurisdictions around the country have reached similar conclusions about Florida law. *Id.* (collecting cases).

Based on the analysis in *Dill*, this court likewise finds that Tennessee law should be applied to the restrictive covenants. In addition, because the parties do not address the issue or argue that they are different, the court will also apply Tennessee law rather than Florida law concerning the interpretation of contracts generally.

### C. The Plaintiffs' Likelihood of Success

As noted above, the defendants' focus in this case is on the plaintiffs' likelihood of success on the merits of their claims, which in turn depends upon whether KSP Holdings 2 can enforce the Agreement. In the alternative, the defendants argue that the non-compete Agreement was superseded by subsequent Incentive Compensation Plan agreements signed by Madison.

#### 1. KSP Holdings 2 Can Enforce the Agreement

The defendants contend as a factual matter that Madison was never actually employed by MHCP or, therefore, KSP Holdings 2. They point out that the Agreement is governed by the term of Madison's "employment" with KSP Holdings 2 and that the "Restricted Period" is defined as

"during [Madison's] employment with the Company and for a period of one year after termination of Employee's employment for whatever reason." (Doc. No. 45-2, Agreement ¶ 2(b).) They argue that, because Madison was neither employed by KSP Holdings 2 nor, logically, terminated from that employment, he is not subject to any "Restricted Period," as a matter of common sense. In other words, their basic position is that, because Madison was never MHCP/KSP Holdings 2's "employee," he is not—and was never—bound by the Agreement.

The legal basis for their argument is that, when a plaintiff seeks to bring tort claims against a parent company of the subsidiary company for which he actually works, courts have generally held that a plaintiff must establish certain specific facts establishing joint employment (or that the parent and subsidiary together constituted a "single employer") in order to find the parent liable. *See, e.g.*, *Branham v. Home Depot U.S.A., Inc.*, 225 F. Supp. 2d 762, 766 n.3 (E.D. Mich. 2002) ("It is well-settled that, in the absence of special circumstances, a parent corporation is not liable for the Title VII violations of its wholly owned subsidiary. Such 'exceptional circumstances' exist where the parent corporation exercises a degree of control that exceeds that normally exercised by a parent corporation." (citations omitted)); *see also Armbruster v. Quinn*, 711 F.2d 1332, 1338 (6th Cir. 1983) ("The appropriate standard [for determining whether a parent corporation and its subsidiary are a single employer for purposes of Title VII] is whether, upon review of the circumstances of the intercorporate relationship, [the parent corporation] exercises a degree of control that exceeds the control normally exercised by a parent corporation which is separate and distinct from the subsidiary corporate entity.")

The defendants also cite *Frontline Technologies Parent, LLC v. Murphy*, No. 2023-0546-LWW, 2023 WL 5424802, at *2 (Del. Ch. Aug. 23, 2023), in which two individuals employed by a subsidiary company signed Equity Agreements with the subsidiary's parent company, pursuant

to which they received substantial financial consideration in exchange for their agreement not to compete with the parent company. The "Non-Competition Period" was defined by the Equity Agreements as the period "spanning the 'Employee's employment by or service to [Parent] and for a period of one (1) year thereafter.'" *Id.* at *3. The court held, first, that the individuals were not actually employed by the Parent. Second, it concluded that, "[e]ven if the defendants provided 'service' to Parent through their work for [the subsidiary], the claims still fail," because the "non-compete provisions are expressly tailored to the 'business' or 'business line' of Parent—not [the subsidiary]," and the complaint did not address the Parent's business or allege that the defendants' new employer competed with the Parent. *Id.* at *3.

Largely ignoring the second part of the holding, the defendants argue that *Murphy* constitutes persuasive authority under the facts presented here, because the plaintiffs cannot establish that Madison was ever employed by KSP Holdings 2. They assert that the only real evidence of an employment relationship to which the plaintiffs point is the Agreement itself, which is not sufficient, standing alone, to establish that Madison was employed by KSP Holdings 2, when the plaintiffs have presented no facts typically relevant to a finding of joint employment (or "single employer").

The plaintiffs, for their part, continue to argue that KSP Holdings 2 and KSP LA were both Madison's employers, pointing to Madison's own understanding of events—for instance, that he characterized the 2014 transaction as a "merger" between TLCRx Pharmacy and MHCP and told Genefic when he went to work for it that he was bound by a non-competition agreement. They also point to a 2014–2015 Open Enrollment Form & Bi-Weekly Payroll Deductions that the plaintiff signed in 2014, waiving insurance coverage, the header of which states "MODERNHEALTH." (Doc. No. 52-1.)

The plaintiffs' evidence, such as it is, is not persuasive, and the court finds as a factual matter that they have not presented any evidence that would establish that KSP Holdings 2 and KSP LA together constituted a "single employer" of Madison, as that term has been defined in the context of Title VII liability. That test focuses on the "(1) interrelation of operations, *i.e.*, common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control." *Satterwhite v. Ashtabula Cty. Metroparks*, 514 F. Supp. 3d 1014, 1024 (N.D. Ohio 2021) (quoting *York v. Tenn. Crushed Stone Ass'n*, 684 F.2d 360 (6th Cir. 1982)). The "central concern" of the inquiry is "control over labor relations," *Armbruster*, 711 F.2d at 1337, the key indicia of which typically include "the authority to hire, fire, set work schedules and assignments, and the obligation to pay or duty to train the party." *Id.* at 1031. Effectively no evidence regarding these matters was presented at the evidentiary hearing.

That said, the court is also not persuaded by the defendants' arguments that the question of whether Madison was technically KSP Holding 2's "employee," as the term is commonly understood, governs resolution of the issue presented here. This is not a tort case; it is a contract case. And the Tennessee Supreme Court has recently recognized that "[t]he common thread in all Tennessee contract cases—the cardinal rule upon which all other rules hinge—is that courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles." *Indiv. Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 688 (Tenn. 2019) (collecting cases). To that end, the "sole object" of the rules used for contract interpretation is "to do justice between the parties, by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time it was made." *Id.* (quoting *McNairy v. Thompson*, 33 Tenn. (1 Sneed) 141, 149 (1853)). "Common sense

must be applied to each case . . . ." *Id.* (quoting *Barnes v. Black Diamond Coal Co.*, 47 S.W. 498, 499 (Tenn. 1898)).

In reviewing the history of contract interpretation in Tennessee, the court found it "clear that Tennessee courts have sought . . . to achieve balance in contract interpretation," rejecting both an "extreme contextual approach" and an "extreme textual approach." *Id.* at 692, 694. Under this balanced approach, "the written words" of a contract remain the "lodestar of contract interpretation," while, at the same time, courts are "entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described." *Id.* at 694 (citation omitted).

So, focusing on the text of the Agreement at issue, here, the introductory paragraph states that it was entered into "between Modern HC Pharmacy, Inc. ('Company') and Brooks Madison ('Employee')." (Doc. No. 45-2, at 2.) By signing the contract as "Employee" in exchange for substantial consideration in the form of *continued* employment and the opportunity to participate in the Incentive Compensation Plan identified in the Agreement, Madison effectively stipulated that he was an "employee" of MHCP, at least for purposes of the Agreement. More specifically, in one of several "whereas" paragraphs, the parties acknowledged that Madison would be provided the "opportunity to earn additional compensation in accordance with the terms of the Incentive Compensation Plan" and mutually agreed that, "in return for and as a condition of continued employment with the Company and the benefits thereof," specifically including both the receipt of "Confidential Information" as defined by the plan and the "opportunity to participate in the Incentive Compensation Plan," "[d]uring the course of Employee's employment with the Company," Madison would not "use or disclose" Confidential Information "obtained by

[Madison] incident to [his] employment with the Company or any of its Affiliates," except in the performance of his duties for the "Company." (Doc. No. 45-2, Agreement ¶ 1.) The term "Affiliates" is defined as "all persons or entities directly or indirectly controlling, controlled by or under common control with the Company" and specifically includes, among others, Total Life Care Rx. Pharmacy, L.L.C. (now known as KSP LA). (*Id.*)

In addition, in consideration for Madison's "employment with the Company" and to protect the goodwill and Confidential Information of the Company and its Affiliates, Madison agreed (1) not to use or disclose the "Company's Confidential Information" except under the circumstances described in the Agreement (*id.* ¶ 2(a)); (2) not to "directly or indirectly . . . engage in the sale of medications to patients" in specifically defined medical arenas, for a period of one year after the termination of his employment for any reason (the "Restricted Period") within the defined "Restricted Area" (*id.* ¶ 2(b)); and (3) not to, during the Restricted Period, directly or indirectly, "solicit or encourage any customer of the Company *or any of its Affiliates*, including but not limited to patients, physicians and their staff, payors, and pharma, in the Restricted Area to terminate or diminish its relationship with them" or "hire or solicit for hiring any employee of the Company *or any of its Affiliates* or seek to persuade any employee of the Company *or any of its Affiliates* to discontinue his or her employment" (*id*. ¶ 2(c)(i)–(ii))).[5]

The text of the Agreement is clear: Madison agreed not to compete with the "Company" or its Affiliates for the Restricted Period within the Restricted Area. Considering the context of the Agreement as well as the text, Madison clearly knew that MHCP had just acquired his direct employer and, by virtue of that relationship, likely had sufficient control over his continued direct

---

[5] Thus, unlike the agreement at issue in *Murphy*, which only protected the "Parent," the Agreement here clearly protects MHCP's "Affiliates" as well.

employment, that, if he had declined to sign the Agreement, he would likely have ceased to be an employee of either MHCP or its subsidiary, TLCRx Pharmacy/KSP LA. He understood that he had signed a non-competition agreement, and he notified Genefic of that Agreement when he accepted its offer of employment. While the Agreement is undoubtedly sloppily written, and much ink and litigation could have been avoided with a little better lawyering on the front end, the fact that Madison agreed for purposes of the Agreement that he was, at the very least, indirectly employed by the "Company" is sufficient to establish that a meeting of the minds occurred. The Agreement is supported by adequate consideration. There is no dispute that KSP Holdings 2 and MHCP are the same entity. KSP Holdings 2 has the capacity to enforce the Agreement against Madison.

Moreover, as an equitable matter, Madison received the benefit of the intended bargain: continued employment and participation in the Incentive Compensation Plan (as discussed below), as well as continued access to the Company's and its affiliates' Confidential Information. "[T]o do justice between the parties," the court will apply some commons sense and, in the words of the Tennessee Supreme Court, enforce the "performance of their agreement according to the sense in which they mutually understood it at the time it was made." *Indiv. Healthcare Specialists*, 566 S.W.3d at 688.

In short, whether Madison technically qualified as an employee of MHCP at the time he signed the Agreement, while not wholly irrelevant, is not determinative under the facts presented here and both the text and context of the Agreement.

2. *The Effect of the Incentive Compensation Plan Agreements*

The defendants assert in the alternative that, even if otherwise enforceable by KSP Holdings 2, the Agreement was superseded by the Incentive Compensation Plan agreements that Madison signed in 2020, 2021, and 2022.

The record contains Incentive Compensation Plan ("ICP") agreements for the years 2014, 2015, 2018, 2020, 2021, and 2022. The 2014 ICP agreement, for example, covers the period July 1, 2014 through December 31, 2014 and provides for the calculation and payment of quarterly bonuses to "Eligible Participants," defined as the "TLCRx Sales Team. (Doc. No. 48-3, at 2.) It provides that "new hires" become eligible for participation beginning on their "start date with TLCRx Modern Health." (*Id.*) Upon signing, Madison stipulated that the document did not constitute "an agreement between the parties with respect to the continued employment of any TLCRx Sales Team Member by Modern HC Pharmacy or its subsidiaries." (*Id.*; *see also id.* at 4.) The 2015 ICP agreement is nearly identical except that it covers the entire 2015 calendar year.

The 2018 ICP agreement reflects the 2016 acquisition of the Modern Health entities by entities under the Kroger umbrella and the resulting entity name changes. It is identified as the "KSP Incentive Compensation Plan." (Doc. No. 48-5, at 2.) This ICP agreement, among other changes, specifically states that it

> represents the entire KSP Incentive Compensation Plan for Specialty Account Managers for May 27, 2018 through February 2, 2019. This agreement can only be changed in writing if approved by the SVP, Sales & Marketing and supersedes all other oral and written agreements between the parties regarding incentive compensation, with the sole exception of the Confidentiality, Non-Disclosure, Non-Competition, and Non-Solicitation Agreement.

(Doc. No. 48-5, at 5.) In addition, in signing this ICP Agreement, Madison specifically acknowledged that his "obligations under the Confidentiality, Non-Disclosure. Non-Competition, and Non-Solicitation Agreement continue to remain in effect." (*Id.*) Because this document correctly names the actual document Madison signed, the defendants do not contend that it supersedes the earlier Agreement.

In 2020, the ICP agreement signed by Madison contains the following merger clause:

> This Agreement represents the entire KSP Incentive Compensation Plan for Specialty Account Managers for February 2, 2020 until an IC plan revision is

published. This agreement can only be changed in writing if approved by the SVP, Sales & Marketing and supersedes all other oral and written agreements between the parties regarding incentive compensation, *with the sole exception of the Business Protection Agreement*.

I acknowledge and understand that my obligations under the *Business Protection Agreement* continue to remain in effect.

(Doc. No. 48-6, at 5 (emphasis added).)

The 2021 ICP agreement signed by Madison contains the following merger clause:

This Agreement represents the entire KSP Incentive Compensation Plan for Specialty Account Managers for January 31, 2021 through the next published IC version. This agreement can only be changed in writing if approved by the VPs of Sales and supersedes all other oral and written agreements between the parties regarding incentive compensation, with the sole exception of the *Employee Confidentiality and Non-Competition Agreement*.

I acknowledge and understand that my obligations under the *Employee Confidentiality and Non-Competition Agreement* continue to remain in effect.

(Doc. No. 48-7, at 5–6 (emphasis added).)

Finally, the 2022 ICP agreement states similarly:

This Agreement represents the entire KSP Incentive Compensation Plan for Specialty Account Managers for January 30, 2022 through the next published IC version. This agreement can only be changed in writing if approved by the VP of Sales and supersedes all other oral and written agreements between the parties regarding incentive compensation, with the sole exception of the *Employee Confidentiality and Non-Competition Agreement*.

I acknowledge and understand that my obligations under the *Employee Confidentiality and Non-Competition Agreement* continue to remain in effect.

(Doc. No. 48-8, at 5 (emphasis added).)

The defendants argue that, insofar as the non-competition Agreement is "enforceable in any respect," it is superseded by the merger clauses in the 2020, 2021, and 2022 ICP agreements because: "(1) Madison's restrictive covenants [in the non-compete Agreement] are clearly 'regarding incentive compensation' and (2) [are] not titled 'Business Protection Agreement' or 'Employee Confidentiality and Non-Competition Agreement.'" (Doc. No. 67, at 17.)

The court understands the defendants to be invoking the doctrine of merger. This doctrine is "well-established in Tennessee" and works to "put[] structure to ascertaining the parties' intent where there are successive agreements." *Shree Krishna, LLC v. Broadmoor Inv. Corp.*, No. W2011-00514-COA-R3CV, 2012 WL 312254, at *14 (Tenn. Ct. App. Feb. 1, 2012) (citing *Dunn v. United Sierra Corp.*, 612 S.W.2d 470, 474 (Tenn. Ct. App. 1980)). Under Tennessee's application of the doctrine, if the parties to a contract enter into a subsequent agreement concerning the same subject matter as a prior one, "the earlier contract . . . merges into the latter contract, and is rescinded or extinguished." *Id.* (quoting Stephen W. Feldman, 22 Tenn. Prac. Series, Contract Law & Practice § 10.11 (2011)). For merger to apply, "the successive contracts must have the same parties, and they generally 'must contain inconsistent terms such that they cannot stand together as supplemental agreements.'" *Id.* (citation and internal quotation marks omitted); *see also Great Am. Ins. Co. v. Nelson, Inc.*, 276 F. Supp. 3d 762, 768 (W.D. Tenn. 2017) ("Inconsistency of terms is the crux of the merger doctrine inquiry."). Under these circumstances, the "subsequent contract then stands as the only contract between [the] parties." *Id.* (quoting *M & M Props. v. Maples*, No. 03A01-9705-CH-00171, 1998 WL 29974, at *10 (Tenn. Ct .App. Jan. 12, 1998)).

It is clear from the face of the Incentive Compensation Plans that they were not intended to supersede the non-compete Agreement, irrespective of whether they excluded it by the proper name. First, the ability to participate in the Incentive Compensation Plan was a large part of the consideration offered in exchange for Madison's agreeing to the restrictive covenants in the non-compete Agreement. The non-compete Agreement anticipated the Incentive Compensation Plan agreements. Second, the non-compete Agreement was not an agreement "regarding incentive compensation" simply by virtue of its offering to Madison the opportunity to participate in the

Incentive Compensation Plan as part of the consideration for his signing the Agreement. The non-compete Agreement does not define incentive compensation, explain the calculation of any incentive payment, outline a payment schedule, or even indicate parameters for eligibility. Third, and most importantly, the terms of the ICP agreements and the non-compete Agreement are not inconsistent; instead, they complement each other. No fair reading of the ICP agreements can result in the conclusion that they were meant to supersede the Agreement, regardless of whether they properly identified the non-compete Agreement as expressly excluded within the merger clause of the various agreements.

The merger doctrine does not apply, and the ICP agreements do not serve to extinguish the non-compete Agreement.

### 3. The Reasonableness of the Restrictive Covenants

KSP Holdings 2 has the capacity to enforce the Agreement, and it is effectively undisputed that Madison has violated the Agreement and that Genefic knew of its existence and acted intentionally to procure its breach. Thus, the only potential impediment to the plaintiffs' likelihood of success on the merits of their breach of contract and tortious interference claims is Tennessee law governing the enforcement of restrictive covenants in the employment context. Regarding that question, although they argue that Tennessee law—which is more favorable to employees than Florida law—applies to this Agreement, the defendants do not seriously contend that the restrictive covenants are unreasonable or unenforceable under Tennessee law.

As noted above, covenants not to compete are generally disfavored in Tennessee, but they are nonetheless enforceable if the party seeking to enforce them has "a legitimate business interest to be protected and the time and territorial limitations are reasonable." *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005). The reasonableness of the limitations depends on such factors as "(1) the consideration supporting the covenant; (2) the threatened danger to the

employer in the absence of the covenant; (3) the economic hardship imposed on the employee by the covenant; and (4) whether the covenant is inimical to the public interest." *Id.* (quoting *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472–73 (Tenn. 1984)).

In this case, the consideration offered for the Agreement was significant, including continued employment and the ability to participate in the Incentive Compensation Plan. Testimony from Jeremy Richardson at the hearing established that the specialty pharmacy industry in Tennessee is competitive, that Madison was essentially the "face" of the company within Tennessee, and that, through his direct customer contact, Madison developed substantial goodwill and trust with the plaintiffs' customers that the company seeks to protect. This evidence is sufficient at this juncture to establish that the plaintiffs had a legitimate, protectible business interest. *Accord HCTec Partners, LLC v. Crawford*, 676 S.W.3d 619, 634 (Tenn. Ct. App. 2022) (finding that the employer had a legitimate protectible business interest where the employee had access to confidential information and repeated contacts with customers); *Hanger Prosthetics & Orthotics E., Inc. v. Kitchens*, 280 S.W.3d 192, 194 (Tenn. Ct. App. 2008) (finding that the plaintiff employer had a protectable interest in the relationships between the defendant and the plaintiff's customers).

The geographic scope of the Agreement is the entire state of Tennessee and adjacent states, but the plaintiffs do not seek to enforce it outside the state of Tennessee; nor do they seek to prevent Madison from "calling on providers" in Tennessee "in therapeutic areas he did not represent" while working for KSP LA. (Doc. No. 65, Hr'g Tr. 156.) The defendants do not contend that the scope of the restrictive covenant, thus limited, is unreasonable, and the court finds it reasonable, insofar as the plaintiffs seek to narrow the geographic scope of the covenant to the state of Tennessee only.

The one-year duration of the Agreement is also clearly reasonable. *Accord Hanger Prosthetics*, 280 S.W.3d at 194 (enforcing a similar non-competition agreement with a two-year duration).

No evidence has been presented suggesting that enforcement of the Agreement that Madison signed voluntarily would cause him substantial hardship. Moreover, as the plaintiffs point out, they do not seek to prevent him from working for Genefic outside the state of Tennessee or in Tennessee in therapeutic areas other than those with respect to which he represented KSP LA. And finally, nothing in the record suggests that enforcement of the Agreement would be inimical to the public interest.

Given these preliminary findings, the court finds that the plaintiffs have established a substantial likelihood of success on the merits on their breach of contract and tortious interference claims.

### D. The Other Elements of the Preliminary Injunction Analysis

The other relevant questions are whether the movant will suffer irreparable injury without a preliminary injunction, whether issuance of a preliminary injunction would cause substantial harm to others, and whether the public interest would be served by issuance of a preliminary injunction. *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). The most important of these is whether the plaintiffs will suffer irreparable harm in the absence of an injunction. *D.T. v. Sumner Cty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019). A movant can show irreparable injury resulting from the denial of a preliminary injunction by showing that, absent an injunction, it will experience a "harm . . . [that] is not fully compensable by monetary damages. " *Overstreet*, 305 F.3d at 578.

In their initial Response to the Motion for Preliminary Injunction, the defendants posited very perfunctorily that KSP FL cannot establish irreparable harm, that the balance of harms "clearly weighs" in favor of Madison, as a mere individual up against a "large organization with

lots of resources" (Doc. No .48, at 18), and that the public interest weighs against enforcing the Agreement. They have not reprised this argument or expanded upon it during the evidentiary hearing or in any of their post-hearing briefs.

The court finds that these factors—some of which dovetail with those relevant to the enforceability of restrictive covenants generally—weigh in the plaintiffs' favor as well. The plaintiffs presented evidence through the testimony of Jeremy Richardson and Madison himself that Madison has solicited both existing KSP customers and employees away from KSP LA and that his continuing to work for Genefic in the same geographic territory and therapeutic field poses a substantial threat of the continued loss of customers and goodwill. These harms are not fully compensable by money damages. *Accord Basicomputer v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." (internal citation omitted). Madison signed a valid and enforceable agreement and enjoyed the benefits of the consideration accorded in exchange, and he has presented no evidence that he will suffer substantial hardship if it is enforced against him.

And finally, the "somewhat nebulous fourth factor requires to court to consider whether entry of an injunction will serve the public interest by, for example, promoting stability and certainty in business and employment relationships." *Int'l Sec. Mgmt. Grp., Inc. v. Sawyer*, No. 3:06CV0456, 2006 WL 1638537, at *8 (M.D. Tenn. June 6, 2006) (Wiseman, J.) (citing *AmeriGas Propane, Inc. v. Crook*, 844 F. Supp. 379, 390 (M.D. Tenn. 1993)). "Companies . . . have a legitimate public interest in keeping certain information confidential and in maintaining their clientele, and Tennessee has recognized that businesses have the right to protect their confidential

and trade secret information as well as their business good will." *Id.* at *10; *see also Selective Ins. Co. of Am. v. KCS Constr., LLC*, No. 1:18-cv-00002, 2018 WL 2183840, at *4 (M.D. Tenn. May 10, 2018) (Crenshaw, J.) ("There is a public interest in enforcing the terms of a valid contract." (quoting *First Nat. Ins. Co. of Am. v. Sappah Bros. Inc.*, 771 F. Supp. 2d 569, 576 (E.D.N.C. 2011))).

The relevant factors weigh in favor of granting a preliminary injunction.

## IV. CONCLUSION

For the reasons set forth herein, the court will grant in part the Motion to Dismiss, dismissing plaintiffs KSP Holdings and KSP FL 2 on the basis that the FAC fails to state a claim on behalf of these entities for which relief may be granted. Otherwise, the Motion to Dismiss will be denied.

The Motion for Preliminary Injunction, brought on behalf of KSP Holdings 2 and KSP LA as the two remaining plaintiffs, will be granted.

An appropriate Order and Preliminary Injunction is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge